HENRY B. GUTMAN (*pro hac vice*)
hgutman@stblaw.com
NOAH M. LEIBOWITZ (*pro hac vice*)
nleibowitz@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

Harrison J. Frahn IV (206822)
SIMPSON THACHER & BARTLETT LLP
2550 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000

Attorneys for Plaintiff and Counter-Defendant
HUMAN GENOME SCIENCES, INC.

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| HUMAN GENOME SCIENCES, INC., <br><br> Plaintiff, <br><br> v. <br><br> GENENTECH, INC. AND CITY OF HOPE, <br><br> Defendants and Counter-Plaintiffs. <br><br> HUMAN GENOME SCIENCES, INC., <br><br> Counter-Defendant, <br><br> AND <br><br> GLAXO GROUP LIMITED and GLAXOSMITHKLINE LLC, <br><br> Third-Party Defendants. | Case No. 2:11-cv-06519-MRP (JEMx) <br><br> **PLAINTIFF HUMAN GENOME SCIENCES, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AND FIFTH COUNTERCLAIMS AND STRIKE THIRD AND SEVENTH AFFIRMATIVE DEFENSES** <br><br> Date: November 21, 2011 <br> Time: 11:00 a.m. <br> Courtroom: 12 <br> Judge: Hon. Mariana R. Pfaelzer |

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

1

2

# **TABLE OF CONTENTS**

Page

INTRODUCTION…………………………………………………….......1

FACTUAL AND PROCEDURAL BACKGROUND……………………………2

ARGUMENT ...................................................................................3

I.    Defendants Ignore the Standard Governing This Motion .................3

II.   This Court's Rulings in *MedImmune* Are Inapposite Here ............5

      A.    *Therasense* Did Not Hold That Antitrust Claims Are Indistinguishable From the Defense of Inequitable Conduct .......5

      B.    Due Process Does Not Permit Dismissing HGS's Pleadings Based on *MedImmune's* Record ....................................6

      C.    This Court's Antitrust Rulings in *MedImmune* Applied an Evidentiary Standard Inapplicable to This Motion to Dismiss ....7

      D.    HGS's Allegations Differ From MedImmune's..........................9

III.  HGS Has Stated a Claim for Inequitable Conduct..........................11

      A.    Dumping Material Information on the PTO Does Not Preclude a Finding of Inequitable Conduct as a Matter of Law ..................................................................................11

      B.    Misrepresentations Regarding § 112 Deficiencies.....................14

      C.    Misrepresentations Regarding the Prior Art..............................16

      D.    Misrepresentations Regarding the Cabilly Patents' Scope ........19

      E.    Concealment of the Best Mode and Misrepresentations Regarding Experimental Conditions Described in the Cabilly II Patent....................................................................21

      F.    False Claim of Priority .........................................................22

      G.    Concealment of the Cabilly Applicants' Exceptional Financial Interest .................................................................23

      H.    Late and Deceptive Filing of the Celltech Settlement Agreement..........................................................................24

IV.   HGS Has Stated a Claim for Unclean Hands...............................25

CONCLUSION………………………………………………………....25

27

28

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

# TABLE OF AUTHORITIES

## CASES

*American Calcar, Inc. v. American Honda Motor Co., Inc.*,
    651 F.3d 1318 (Fed. Cir. 2011) ...................................................... 11

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
    725 F.2d 1359 (Fed. Cir. 1984)........................................................ 8

*Amgen, Inc. v. Ariad Pharmaceuticals, Inc.*,
    577 F. Supp. 2d 702 (D. Del. 2008)........................................ 16, 18

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ................................................................... 3

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................. 3, 24

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*,
    402 U.S. 313 (1971) ....................................................................... 7

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
    326 F.3d 1226 (Fed. Cir. 2003)................................................. 11, 15

*Consolidated Aluminum Corp. v. Foseco International Ltd.*,
    910 F.2d 804 (Fed. Cir. 1990)....................................................... 21

*Delano Farms Co. v. California Table Grape Commission*,
    No. 3689247 (Fed. Cir. Aug. 24, 2011) ........................................ 4

*Digital Control Inc. v. Charles Machine Works*,
    437 F.3d 1309 (Fed. Cir. 2006)..................................................... 22

*Environ Products, Inc. v. Total Containment, Inc.*,
    No. 9504467, 1997 WL 364464 (E.D. Pa. June 19, 1997) ........... 18

*eSpeed, Inc. v. Brokertec USA, L.L.C.*,
    480 F.3d 1129 (Fed. Cir. 2007)..................................................... 12

*Ferring B.V. v. Barr Laboratories, Inc.*,
    437 F.3d 1181 (Fed. Cir. 2006)..................................................... 23

*Fireman's Fund Ins. Co. v. City of Lodi*,
    302 F.3d 928 (9th Cir. 2002).......................................................... 3

*Fiskars, Inc. v. Hunt Manufacturing Co.*,
    221 F.3d 1318 (Fed. Cir. 2000)................................................. 12, 13

*Fox Industries, Inc. v. Structural Preservation Systems, Inc.*,
    922 F.2d 801 (Fed. Cir. 1991)................................................... 17, 20

*GE Capital Corp. v. Lease Resolution Corp.*,
    128 F.3d 1074 (7th Cir. 1997)........................................................ 7

*Genentech, Inc., v. Trustees of the University of Pennsylvania*,
No. 10-CV-2037, 2011 WL 1936136, (N.D. Cal. May 20, 2011) ............ 4, 14

*Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.*,
837 F. Supp. 1444 (N.D. Ind. 1992) ................................................. 18

*Hoffman-La Roche, Inc. v. Promega Corp.*,
323 F.3d 1354 (Fed. Cir. 2003) ....................................................... 22

*In re DDAVP Direct Purchaser Antitrust Litigation*,
585 F.3d 677 (2d Cir. 2009) ............................................................ 7

*Jersey Asparagus Farms, Inc. v. Rutgers University*,
No. 10-2849, 2011 WL 2148631 (D.N.J. May 31, 2011) ........................ 4-5

*KangaROOS U.S.A., Inc. v. Caldor, Inc.*,
778 F.2d 1571 (Fed. Cir. 1985) .......................................... 8, 14, 22, 23

*Kathrein-Werke KG v. Radiacion y Microoondas S.A.*,
No. 07 C 2921, 2011 WL 4460393 (N.D. Ill. Sept. 26, 2011) ................... 11

*Kingsdown Medical Consultants v. Hollister Inc.*,
863 F.2d 867 (Fed. Cir. 1988) ........................................................ 20

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ........................................................... 7

*Li Second Family L.P. v. Toshiba Corp.*,
231 F.3d 1373 (Fed. Cir. 2000) ....................................................... 22

*Life Technologies, Inc. v. Clontech Labs., Inc.*,
224 F.3d 1320 (Fed. Cir. 2000) ....................................................... 19

*McKesson Information Solutions, Inc. v. Bridge Medical Inc.*,
487 F.3d 897 (Fed. Cir. 2007) .................................................... 15, 20

*MedImmune, Inc. v. Genentech, Inc.*,
No. 03-2567 (C.D. Cal. Jan. 14, 2011) .......................................... 5, 7, 8

*MedImmune, Inc. v. Genentech, Inc.*,
No. 03-2567 (C.D. Cal. Feb. 18, 2011) ........................................... 9, 24

*Molins PLC v. Textron*,
48 F.3d 1172 (Fed. Cir. 1995) ........................................................ 11

*Nilssen v. Osram Sylvania, Inc.*,
440 F. Supp. 2d 884 (N.D. Ill. 2006) ............................................... 23

*Oracle Corp. v. DrugLogic, Inc.*,
No. C 11-00910 JCS, 2011 WL 3443889 (N.D. Cal. Aug. 8,
2011) ......................................................................................... 4

*Ormco Corp. v. Align Technology, Inc.*,
No. CV 03-16 CAS (Anx), 2009 WL 466070 (C.D. Cal. Feb. 23,
2009) ....................................................................................... 19

-iii-

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

*Pfizer Inc. v. Teva Pharm. USA, Inc.*,
  No. 2:10cv128, 2011 WL 3610654 (E.D. Va. Jan. 18, 2011)...................... 12

*Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*,
  438 F.3d 1123 (Fed. Cir. 2006)................................................. 3, 22

*Refac International, Ltd. v. Lotus Development Corp.*,
  81 F.3d 1576 (Fed. Cir. 1996)................................................. 15, 19

*Rohm & Haas Co. v. Crystal Chemical Co.*,
  722 F.2d 1556 (Fed. Cir. 1983)....................................... 12, 14, 15, 16

*Sanders v. The Mosaic Co.*,
  418 Fed. Appx. 914 (Fed. Cir. 2011) ........................................... 23

*Scripps Clinic & Research Foundation v. Genentech, Inc.*,
  927 F.2d 1565 (Fed. Cir. 1991)............................................. 12, 13

*Sprint Communications Co. L.P. v. Nuvox Communications Inc.*,
  No. 08-2047, 2009 WL 86565 (D. Kan. Jan. 12, 2009)............................ 20

*Steierman v. Connelly*,
  192 USPQ 433 (Bd. Pat. Int. 1975).......................................... 21

*The Braun Corp. v. Vantage Mobility International, LLC*,
  No. 2:06-CF-50-JVB-PRC, 2010 WL 403749 (N.D. Ind. Jan. 27, 2010)............................................................................... 4

*Therasense, Inc. v. Becton, Dickinson and Co.*,
  649 F.3d 1276 (Fed. Cir. 2011)..........................................*passim*

*Transweb, LLC v. 3M Innovative Properties Co.*,
  No. 10-4413 (FSH), 2011 WL 2181189 (D.N.J. June 1, 2011).................... 6

**STATUTES**

35 U.S.C. § 135 ................................................................. 24

**REGULATIONS**

37 C.F.R. 1.552................................................................. 16

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

Plaintiff Human Genome Sciences, Inc. ("HGS") hereby respectfully submits this opposition to Defendants Genentech, Inc. and City of Hope's ("Defendants'") motion to dismiss HGS's counterclaims and affirmative defenses of inequitable conduct and unclean hands.

## **INTRODUCTION**

Defendants misstate the standard on this motion to dismiss, ignore the law governing HGS's inequitable conduct claims—including changes in the law since this Court's decisions in *MedImmune*—and disregard the bulk of HGS's specific allegations.  Taking all allegations as true and in a light most favorable to HGS, as the Court is required to do on Defendants' motion, HGS has stated a claim for inequitable conduct with the particularity required under governing Federal Circuit law.

*First*, Defendants ignore the basic parameters of a Rule 12 motion.  Defendants repeatedly stray outside the four corners of HGS's Answer, misleadingly citing to cherry-picked and, in some cases, previously sealed materials from prior proceedings, and inviting the Court to conclude that its previous decisions in *MedImmune* dispose of HGS's claims here.  Under basic notions of due process, however, the prior decisions of this Court in *MedImmune*—made on the record developed in that case, after discovery, on distinct allegations, by different parties, and following detailed summary judgment briefing—do not support Defendants' position and have no bearing on this motion.

*Second*, Defendants erroneously suggest that the Court's dismissal of antitrust claims in *MedImmune* (while specifically acknowledging the sufficiency of MedImmune's legally distinct inequitable conduct claims) mandates dismissal of HGS's inequitable conduct claims here.  However, *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276 (Fed. Cir. 2011), on which Defendants rely, did not overrule decades of black-letter Federal Circuit law holding that inequitable conduct is legally distinct from an antitrust violation.  *Therasense* merely clarified

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

the standard for *proving*, not *pleading*, inequitable conduct on the merits and then remanded that case for additional fact-finding on a record that parallels a number of HGS's allegations here. To the extent that either *Therasense* or this Court's decisions in *MedImmune* are relevant here at all, it is in their mutual finding that inequitable conduct claims *were* properly stated, as a matter of law, notwithstanding disputed issues of fact.

  *Finally*, applying the correct standard governing the pleading of inequitable conduct on a motion to dismiss, HGS's allegations easily suffice. Having ignored most of HGS's specific factual assertions, Defendants do not and cannot suggest that HGS has failed to plead any particular element of inequitable conduct with sufficient particularity. Defendants simply fall back time and again on the mistaken proposition that this Court has already decided the issue (it has not), or misapply the law by mistakenly arguing that disclosure to the PTO in *any form*— and at any time—is a blanket "cure" for inequitable conduct (it is not). Because HGS's allegations state a claim for inequitable conduct under longstanding Federal Circuit law, Defendants' motion must be denied.

## **FACTUAL AND PROCEDURAL BACKGROUND**

  On January 25, 2011, HGS filed this action in U.S. District Court for the District of Delaware, seeking a declaratory judgment of non-infringement and invalidity of Defendants' U.S. Patent No. 6,331,415 (the "Cabilly II patent"). The case was subsequently transferred to this Court on Defendants' motion, and, on August 15, 2011, Defendants filed an Answer and Counterclaims accusing HGS's drug BENLYSTA® of infringing the Cabilly II patent.

  On September 9, 2011, HGS filed a counter-defendant Answer and Counterclaims (the "Answer") alleging, *inter alia*, inequitable conduct and unclean hands. Docket No. 69. HGS's Answer contains in excess of forty pages of detailed and specific allegations setting out Defendants' inequitable conduct, including numerous misrepresentations and omissions regarding prior art, written description

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

1  and enablement problems, and other issues. *Id.* On October 3, 2011, Defendants

2  then filed this motion, incorporating by reference papers filed in support of their

3  motion to dismiss HGS's separate antitrust case and requesting judicial notice of

4  prior proceedings before this Court that involved different parties, claims,

5  procedural postures and different factual and legal issues.

6  **ARGUMENT**

7  **I.      Defendants Ignore the Standard Governing This Motion**

8          In reviewing the sufficiency of pleadings on a Rule 12(b)(6) motion,

9  "all factual allegations are taken as true and construed in the light most favorable to

10 plaintiffs." *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939 (9th Cir.

11 2002). "When there are well-pleaded factual allegations, a court should assume

12 their veracity and then determine whether they plausibly give rise to an entitlement

13 to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). This does not impose a

14 "probability requirement at the pleading stage," only a requirement to plead "enough

15 fact[s] to raise a reasonable expectation that discovery will reveal evidence" to

16 support the claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

17         It is black-letter law that patent applicants are required to "prosecute

18 patents in the [PTO] with candor and good faith, including a duty to disclose

19 information known to the applicants to be material to patentability." *Purdue*

20 *Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1128 (Fed. Cir. 2006). A

21 breach of a patent applicant's duty of candor may constitute inequitable conduct. *Id.*

22 Inequitable conduct requires that an individual associated with the prosecution of a

23 patent application (i) make an affirmative misrepresentation of a material fact, fail to

24 disclose material information, or submit materially false information and (ii) act

25 with intent to deceive the PTO. *Exergen* v. *Wal–Mart Stores, Inc.*, 575 F.3d 1312,

26 1327 n.3 (Fed. Cir. 2009); *Therasense*, 649 F.3d at 1287. Contrary to Defendants'

27 suggestion, HGS need not, at this stage, adduce all of the *evidence* it will ultimately

28 use to support its claims, nor must HGS *prove* materiality or intent. *Exergen*, 575

F.3d at 1327 (Fed. Cir. 2009) ("[K]nowledge and intent may be averred generally . . . ."). Instead, HGS need only "identify the specific who, what, when, where, and how of the material misrepresentation or omission committed." *See id.* at 1328-29.

Defendants also incorrectly suggest that HGS must plead circumstances from which the intent to deceive is the "single most reasonable inference able to be drawn." Motion at 3:27-4:5. That standard applies to *proving*, not pleading, inequitable conduct. *See, e.g.*, *Therasense*, 649 F.3d at 1290; *see also The Braun Corp. v. Vantage Mobility Int'l, LLC*, No. 2:06-CF-50-JVB-PRC, 2010 WL 403749, at *8 (N.D. Ind. Jan. 27, 2010) (rejecting argument that, at the pleading stage, the inference of intent must be "the single most reasonable inference able to be drawn from the evidence"). Instead, HGS's allegations need only give rise to an *inference* of intent to deceive that is "plausible and that flows logically from the facts alleged." *Exergen*, 375 F.3d at 1329 n.5. At the pleading stage, the inference of intent need not be the only conclusion that can be drawn; "it need only be one (of potentially several) reasonable inferences." *Genentech, Inc., v. Trustees of the Univ. of Pa.*, No. 10-CV-2037, 2011 WL 1936136, at *9 (N.D. Cal. May 20, 2011).[1]

Finally, Defendants repeatedly argue that *Therasense* "clarified the pleading standard for allegations of inequitable conduct." Motion at 3. But cases since *Therasense* have recognized that the decision did *not* address the requirements for *pleading* inequitable conduct, but rather clarified what a party must do to prove inequitable conduct at trial. *See, e.g.*, *Delano Farms Co. v. Cal. Table Grape Comm'n*, --- F.3d ---, 2011 WL 3689247, at *10 (Fed. Cir. Aug. 24, 2011) (citing *Therasense*, but applying *Exergen* to deny motion to dismiss inequitable conduct allegations); *Oracle Corp. v. DrugLogic, Inc.*, No. C-11-00910, 2011 WL 3443889, at *13 (N.D. Cal. Aug. 8, 2011) (noting that *Therasense* "addressed the heightened standards not for pleading but for proving the elements of [inequitable conduct]");

---

[1]    While *Genentech* preceded the Federal Circuit's decision in *Therasense*, *Therasense* does not purport to change this standard at the pleading stage.

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

*Jersey Asparagus Farms, Inc. v. Rutgers Univ.*, No. 10-2849, 2011 WL 2148631, at *14 (D.N.J. May 31, 2011) ("*Therasense* does not address the initial pleading stage . . . ."); *cf. Therasense*, 649 F.3d at 1304-05 (concurring and dissenting opinions noting pleading standard under *Exergen*).  The principles articulated by the Federal Circuit in *Exergen* thus continue to govern motions to dismiss.

Moreover, the *Therasense* court remanded that case for *additional fact-finding* on claims remarkably similar to many of HGS's claims here, confirming that these allegations raise issues of fact inappropriate for resolution on the pleadings. *Compare Therasense*, 649 F.3d at 1296 (remanding for an assessment of patentee's earlier, inconsistent arguments to the European Patent Office ("EPO")) *with* Answer ¶¶ 97-101, 106, 110-15 (describing Defendants' misleading arguments to PTO in light of their failure to disclose earlier, inconsistent arguments before the EPO).  Far from supporting Defendants' motion to dismiss, *Therasense* thus affirms that disputed issues such as materiality, falsity, and intent to deceive must be resolved by the fact-finder after discovery, not at the pleading stage.

## II.   This Court's Rulings in *MedImmune* Are Inapposite Here

Defendants are also mistaken in arguing that the Court's disposition of MedImmune's *antitrust* claims, after discovery and following fully briefed summary judgment motions, bars HGS's legally distinct *inequitable conduct* claims at the pleadings stage.  *See, e.g.*, Motion at 7:4-8:3.

### A.    *Therasense* Did Not Hold That Antitrust Claims Are Indistinguishable From the Defense of Inequitable Conduct

Defendants incorrectly assert that *Therasense* requires this Court to dispose of HGS's *inequitable conduct* defense based on its dismissal of *antitrust* claims in *MedImmune*.  Indeed, those rulings acknowledged that MedImmune *had* pled inequitable conduct—a claim that was later settled by the parties—and specifically noted the clear distinction between an *affirmative* antitrust claim and an inequitable conduct *defense*, as recognized by decades of black-letter Federal Circuit

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

law.  *See id.* at *18-20 and cases cited therein (noting that "inequitable conduct is an equitable defense, whereas fraud is an affirmative claim," and comparing the "treble damages available in antitrust with the remedies of patent unenforceability and possibly attorney's fees that are available for inequitable conduct.").  *Therasense*, on which Defendants rely, did not *sub silentio* overrule decades of unambiguous, hornbook case law and collapse antitrust and inequitable conduct claims into a single doctrine, as courts since *Therasense* have recognized.  *See, e.g.*, *Transweb, LLC v. 3M Innovative Props. Co.*, No. 10-4413 (FSH), 2011 WL 2181189, at *12 (D.N.J. June 1, 2011) (continuing to hold, post-*Therasense*, that "Walker Process fraud differs from inequitable conduct").[2]

**B.    Due Process Does Not Permit Dismissing HGS's Pleading Based on *MedImmune's* Record**

More importantly, this Court's prior rulings in *MedImmune* were based on the unique factual and procedural record developed in that case, as well as the presentation of different claims and legal issues from those presented here.  Those rulings—delivered after discovery and premised, in significant part, on undue delay and apparent gamesmanship—cannot collaterally estop HGS here or deny HGS the

---

[2]    Defendants place great importance on counsel's purported statement at a hearing on HGS's antitrust case that HGS's "inequitable conduct claims are governed by 'the same standard as *Walker Process* fraud.'"  Motion at 4:20-27, citing Transcript at 26:26-27:7.  Defendants misstate what counsel said and the context in which he said it.  In the cited transcript excerpt at 27:5-7, counsel actually said that the standards are "essentially the same," in arguing that *Therasense* could not bar HGS's *antitrust claims*, because *Therasense*—at most—affected the standards governing *inequitable conduct*, not those governing *Walker Process* fraud.  Transcript at 26:26-27:7.  By contrast, the quote that Defendants inaccurately and misleadingly excerpt appears *20 pages later* in the transcript—on page 47—during an unrelated discussion about whether there will be overlapping *discovery* on HGS's inequitable conduct and antitrust claims, in the context of Defendants' request for a stay.  *Id.* at 47:1-19.  In context, counsel was clearly referring to the requirement, after *Therasanse*, that a party must now prove but-for materiality in order ultimately to prevail on certain claims of inequitable conduct.  *See, e.g.*, *id.* at 26:26-27:7.  There is no dispute that HGS has pled but-for materiality here.  Counsel's statements at the hearing certainly do not support Defendants' position that this Court's prior rulings have anything to do with this motion, much less are dispositive of it.

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

opportunity to take discovery on its timely, distinctive, well-pled claims as a matter of due process.  *See generally Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971); *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 692 (2d Cir. 2009) (rejecting as a "logical non sequitur" the argument that dismissal could be based on district court's resolution of related inequitable conduct case, because "the record in this case could be different following discovery").  For this reason, the Court cannot take judicial notice of the truth of any factual decisions made in *MedImmune*.  *See, e .g.*, *Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001) ("On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein . . . ."); *see also GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997) (noting that a court cannot "achieve through judicial notice what it cannot achieve through collateral estoppel," where a plaintiff was "never . . . afforded the opportunity to present its evidence and arguments on the claim").[3]

## C.   This Court's Antitrust Rulings in *MedImmune* Applied an Evidentiary Standard Inapplicable to This Motion to Dismiss

Beyond due process, the Court's decisions in *MedImmune* were based on presumptions and *evidentiary* standards inapplicable on this motion to dismiss.  *See, e.g.*, Orloff Decl. ¶ 2, Ex. A (MSJ Order) at *22 ("[T]he PTO is *presumed* to be aware of the references before it . . . .  MedImmune cannot show that the PTO relied on alleged misrepresentations . . . because the examiner is *presumed* to have

---

[3]   This Court's decision to stay HGS's antitrust case is likewise inapposite. Notably, the Court *declined to grant* Defendants' motion or to hold that HGS had failed adequately to plead fraud in connection with its antitrust case.  *See* Docket No. 77 (September 22, 2011 Order) at 1.  The Court indicated that, if the case were not stayed, it saw "merit" in Genentech's motion and that HGS would be required to amend its antitrust Complaint to proceed.  *Id.*  The Court did not find that pleading an antitrust violation would be impossible on the facts of this case, as Defendants incorrectly suggest, and the Court certainly did not address the very different factual and legal issues raised by the instant motion.

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

independently considered the references . . . . ") (emphasis added).  The case on which the Court relied for that presumption specifically recognized that the presumption is rebuttable.  *See id.* at *22 (citing *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1359, 1359 (Fed. Cir. 1984)).  A rebuttable presumption certainly cannot justify dismissal on the *pleadings* of HGS's claims, which explicitly allege highly relevant circumstantial evidence of intent to deceive, such as the timing and manner in which Defendants submitted numerous material references, in conjunction with contemporaneous misrepresentations that were intended to (and did) mislead the PTO.  *See, e.g.*, Answer ¶¶ 92-93, 103-104, 107, 140, 143.

Next, the Court's requirement that MedImmune prove "independent or clear evidence of deceptive intent," Orloff Decl. ¶ 2, Ex. A (MSJ Order) at *21-22, is inconsistent with the standard later set forth in *Exergen*, which requires merely that HGS plead "sufficient underlying facts from which a court may reasonably infer" that Defendants acted deliberately.  *Exergen*, 375 F.3d at 1327.  "A reasonable inference is one that is plausible and that flows logically from the facts alleged . . . ."  *Id.* at 1329 n.5.  As the Federal Circuit has repeatedly recognized, "direct evidence of deceptive intent is rare," and intent may properly be inferred from indirect and circumstantial evidence.  *See, e.g.*, *Therasense*, 649 F.3d at 1290; *see also KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1573 (Fed. Cir. 1985) (holding that disputed question of intent to deceive is not appropriate for summary resolution).  Here, HGS has pled sufficient facts from which to infer that Defendants, their agents, the inventors and those involved in prosecuting the Cabilly II patent knew of and deliberately misled the PTO regarding fundamental issues of anticipation, obviousness, written description, enablement, priority, and best mode.  Answer ¶¶ 67-78, 83-85, 91-99, 103-109, 112-13, 115-16, 120, 123, 124, 126, 130-134, 137.

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

Finally, it is irrelevant here that, after discovery and a fully briefed and decided summary judgment motion, the Court denied MedImmune leave to amend its pleadings. *See* Orloff Decl. ¶ 3, Ex. B (*MedImmune, Inc. v. Genentech, Inc. et al.*, No. 03-2567, Mem. of Decision, Dkt. No. 148) ("Order Denying Leave") at *3-*4. That decision was based largely on the Court's finding that MedImmune's efforts to amend were late, strategic, made in bad faith and prejudicial, not merely—as Defendants suggest—futile. *See id.* at *3-*7 (explaining the bases for denial, including prejudice, bad faith in re-asserting claims on which the Court had already ruled, prior opportunity to amend, undue delay in seeking to amend based on previously discovered information, procedural gamesmanship and futility). By contrast, all of HGS's allegations appear in its initial Answer, and the Court is required to accept the factual allegations as true at this stage.[4]

### D. HGS's Allegations Differ From MedImmune's

HGS also proffers new facts and legal theories—many of which occurred or came to light years after *MedImmune* and so could not have been at issue then—in a context different from *MedImmune*. These include, among other things, (i) Defendants' false assertion during reexamination that the Axel patent was "irrelevant" to the Cabilly II patent, in direct contradiction of sworn testimony by Genentech's scientist, John Ridgway, that the two patents teach and are relevant to the exact same process, Answer ¶¶ 112-113; (ii) Defendants' admission by their proffered expert, Dr. Matthew Scott, that the undisclosed Axel patent fully

---

[4] The inequity of Defendants' attempt to foreclose all opportunity for discovery is highlighted by Defendants' decision to unseal—for the first time— MedImmune's proposed Second Amended Complaint in support of their instant motion. RJN, Ex. 2. MedImmune's Second Amended Complaint was a sealed document from a separate proceeding to which HGS was not party. HGS therefore had no access to that paper before Defendants voluntarily unsealed it. Of course, Defendants unsealed only the single paper from that proceeding that they self-servingly decided would support their motion. HGS has had no access to any other part of that record. Indeed, when HGS asked Defendants to provide the related pleadings that *led up to* the Court's decision on MedImmune's motion to amend, Defendants categorically refused. Orloff Decl ¶ 4, Ex. C.

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

anticipated a process for making a heavy or light chain in a single host cell as required by the Cabilly I patent claims, thereby tainting the Cabilly II patent through infectious unenforceability, *id.* ¶ 114; (iii) Defendants' failure to disclose to the PTO the May 2001 EPO Appeal Board decision finding that the specification did not enable the breadth of subject matter claimed, *id.* ¶¶ 116-17; (iv) Defendants' submission of inventor declarations falsely asserting that they achieved experimental results "significantly higher than background levels . . . obtained from controls," whereas inventor Wetzel admitted that the results were "barely measurable above background," *id.* ¶¶ 123-124; (v) Defendants' assertion during reexamination, through the argument and testimony of Jeffrey Kushan and Dr. Steven McKnight, that the Cabilly II patent requires the production of *functional* antibody—in order to overcome a double-patenting challenge—while failing to disclose the directly contradictory assertions made to administrative patent judges of the PTO's Board of Patent Appeals and Interferences ("BPAI") during the Boss interference that the "invention . . . does not require that an active antibody be produced directly," in order to survive enablement and priority challenges, *id.* ¶¶ 129-133; (vi) Defendants' misrepresentations during reexamination that the intended scope of the Cabilly I patent was "heavy *or* light" immunoglobulin chains—in order to survive an obviousness-type double patenting rejection to the Cabilly II patent— while failing to disclose earlier, directly contradictory statements during the prosecution of the Cabilly I patent asserting that it required co-expression of both "heavy *and* light" chains, *id.* ¶ 133; (vii) context-dependent, mutually inconsistent, self-serving and misleading characterizations by the inventors regarding whether co-transformation of heavy and light chains in a single host cell was or was not "doable" at the time the inventors purportedly achieved their invention, *id.* ¶ 134; (viii) Defendants' misrepresentations regarding the experimental conditions used to practice the invention and deliberate concealment of the best mode, *id.* ¶¶ 118-127, and (ix) the Cabilly applicants' submission of sworn testimony to the PTO while

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

failing to disclose the extraordinary extent of the royalties they had received and would receive on the patent. *Id.* ¶¶ 136-37. None of these allegations was presented in this context by MedImmune, and many of them pertain to events that occurred years *after MedImmune*, during reexamination, illustrating Defendants' continued pattern of deceit before the PTO.

## III.   HGS Has Stated a Claim for Inequitable Conduct

### A.   Dumping Material Information on the PTO Does Not Preclude a Finding of Inequitable Conduct as a Matter of Law

Nearly all of Defendants' attempts to bar HGS's claims rest on a single, false premise: that disclosure to the PTO of a reference—regardless of the time, place or manner of that "disclosure"—precludes any inequitable conduct claim as a matter of law. *See, e.g.*, Motion at 9:5-12. This argument fails.

First, the Federal Circuit has unequivocally rejected the proposition that the eventual disclosure of material information necessarily cures prior misrepresentations and material non-disclosures. *See, e.g.*, *Molins PLC v. Textron*, 48 F.3d 1172, 1182 (Fed. Cir. 1995) (affirming inequitable conduct and stating that "[w]e recognize that [the withheld references] were cited eventually to the PTO and that the examiner initialed them and passed the reexamination application to issue thereafter. *However, the references were not cited when they should have been*.") (emphasis added) (cited in *Therasense*, 649 F.3d at 1288); *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1237 (Fed. Cir. 2003) (affirming inequitable conduct despite examiner's independent discovery of undisclosed reference, patentee's voluntary disclosure of reference in subsequent reissue filing, and examiner's decision to reissue the patent); *see also Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318, 1332-36 (Fed. Cir. 2011) (remanding for further fact-finding in light of *Therasense* where, *inter alia*, patentee provided some previously withheld materials in reexamination); *cf. also Kathrein-Werke KG v. Radiacion y Microondas S.A.*, No. 07 C 2921, 2011 WL 4460393, at *11 (N.D. Ill.

-11-

Sept. 26, 2011) (rejecting argument that previously withheld drawings could not be material in light of *Therasense*, notwithstanding that PTO considered drawings during reexamination and found them immaterial).

More generally, the Federal Circuit has never held—and certainly did not suggest in *Therasense*—that "dumping" thousands of pages of paper on the PTO at the eleventh hour vitiates any claim of inequitable conduct as a matter of law, especially where, as here, documents were disclosed only *after* the examiner had given oral notice that the claims would issue.  *See* Orloff Decl. ¶ 6, Ex. E, at *6 (Amendment After Interference, Oct. 4, 2001) (noting that, "during the interviews, Examiner Gambel indicated that the claims would be allowable upon correction . . . of minor informalities in the specification and claims").  To the contrary, the Federal Circuit has frequently found disclosure inadequate in like circumstances.  *See, e.g.*, *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 480 F.3d 1129, 1137 (Fed. Cir. 2007) (affirming inequitable conduct and noting that, "[e]ven though [applicant] provided the examiner with 1139 pages of material describing the [invalidating prior art,] we agree with the district court that the 'blizzard of paper' submitted to the PTO in conjunction with the declaration . . . 'left the examiner with the impression that the examiner did not need to conduct any further investigation'"); *Rohm & Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556, 1563-65 (Fed. Cir. 1983) (rejecting assertion that "complete disclosure of all material facts" precluded finding of inequitable conduct, where district court's conclusion that the examiner was "fully informed" was "unrealistic" and "rested solely on the presentation to him of a mountain of largely irrelevant data from which he is presumed to have been able . . . with adequate time, to have found the critical data"); *see also Pfizer Inc. v. Teva Pharm. USA, Inc.*,  No. 2:10cv128, 2011 WL 3610654, at *3 (E.D. Va. Jan. 18, 2011)

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

(ruling that allegations of omitting or having "buried" the material disclosure are sufficient to meet the requirements of Rule 9(b) as set out in *Exergen*).[5]

This case law is particularly relevant here, because HGS has pled sufficient facts to demonstrate not only that Defendants' "disclosures" were untimely and presented disingenuously—only after telephone interviews in which the examiner indicated the claims would issue—but that they were too little, too late to cure the myriad affirmative misrepresentations Defendants had *already* made to the PTO.  Indeed, one of the very issues on which HGS needs discovery is what oral representations the prosecuting attorneys made during the interviews in September and October 2001 that persuaded the examiner to issue the claims before he received and/or had time to meaningfully consider the innumerable materials dumped on him, much less to discover the true facts Defendants had misrepresented months or years earlier.

In addition, as set out below, HGS's allegations are not limited to material omissions.  HGS describes numerous instances where Defendants, their agents, the inventors and those involved in prosecuting the patents affirmatively misrepresented material facts, including the best mode used to practice the invention, the experimental conditions described in the specification, enablement issues, the prior art, the scope of the Cabilly I and II patents, and the state of the art.

---

[5]   *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. 1991) and *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318 (Fed. Cir. 2000), which Defendants have previously cited for the proposition that belated disclosure somehow insulates their inequitable conduct, are not to the contrary.  In *Fiskars*, the Federal Circuit affirmed a finding—*after trial*—that no inequitable conduct occurred where the patentee submitted relevant art to the examiner as one of only thirteen references, and the examiner *independently decided* not to consider it.  *Fiskars*, 221 F.3d at 1327.  Similarly, in *Scripps*, the court affirmed *summary judgment* where an abstract the patentee failed to cite was included in other materials actually considered by the examiner.  *Scripps*, 927 F.2d at 1582.  Neither case arose on the pleadings, and neither involved a defendant's deliberate and affirmative efforts to prevent the PTO from actually considering material information through a calculated pattern of misrepresentation and concealment, as HGS alleges here.

-13-

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

Under these circumstances, the Federal Circuit has unambiguously held that "[i]t does not suffice that one knowing of misrepresentations in an application or in its prosecution merely supplies the examiner with accurate facts without calling his attention to the untrue or misleading assertions sought to be overcome, leaving him to formulate his own conclusions." *Rohm*, 722 F.2d at 1572.  Indeed, Genentech itself has argued "that inequitable conduct can be based on misstatements of facts that are otherwise before the examiner." *Genentech*, 2011 WL 1936136, at *8 (citing Genentech's briefing and *KangaROOS*, 778 F.2d at 1576 for proposition that "lapse on the part of the examiner does not excuse the applicant").  Thus, an affirmative correction of Defendants' prior misrepresentations was required, *id.*, and HGS has adequately pled that Defendants made no such correction here.

Indeed, *Therasense* itself recognized that "*affirmative* acts of egregious misconduct, such as the filing of an unmistakably false affidavit," are inherently material, regardless of whether they meet the "but-for" standard. *Therasense*, 649 F.3d at 1292 (emphasis added).  As set forth below, HGS alleges numerous intentional, affirmative, and unmistakably false assertions to the PTO, including by way of inventor and expert affidavits, and other "egregious misconduct" as described in *Therasense*.  *Id.*

## B.  Misrepresentations Regarding § 112 Deficiencies

HGS has adequately pled inequitable conduct stemming from Defendants' and the inventors' misrepresentations regarding the Cabilly II patent's lack of enablement and inadequate written description.  HGS alleges that (i) the Cabilly II patent specification fails to teach the refolding of heavy and light chains into a functional antibody, as necessary to enable the invention; (ii) Defendants knew of this deficiency and possessed the uncontradicted testimony of two experts, Drs. Burton and Abrahmsen, attesting to it; (iii) Defendants concealed the refolding problem from the PTO; (iv) Defendants failed to submit the Burton and Abrahmsen opinions to the PTO until after the examiner indicated that the claims would issue;

-14-

(iv) when Defendants did produce the Burton and Abrahmsen opinions to the PTO, they did so in a manner deliberately designed to ensure the examiner would never find them, by dumping eleven boxes of litigation documents and 350 references on the examiner mere days before the claims issued; and (v) Defendants failed to disclose during prosecution the highly material finding of the EPO Appeal Board in May 2001 that the specification did not enable the production of antibodies in any eukaryotic host cell. *Id.* ¶¶ 65-70, 72, 77, 91-95; 116-17.  Each of these non-disclosures was highly material, because they demonstrated critical flaws in the application and corroborated an enablement problem previously identified by the PTO.  *See id.* ¶ 56.  These allegations alone state a claim for inequitable conduct. *See, e.g.*, *McKesson Inf. Solutions, Inc. v. Bridge Medical Inc.*, 487 F.3d 897, 919 (Fed. Cir. 2007) ("[A] contrary decision of another examiner reviewing a substantially similar claim meets the . . . threshold materiality test."); *Bristol-Myers*, 326 at 1237 (Fed. Cir. 2003) (holding that non-disclosure of reference suggesting patent was not enabled constituted inequitable conduct).

HGS also alleges that Defendants engaged in several *affirmative* misrepresentations regarding enablement, including (i) falsely asserting the methods disclosed in the specification were used to produce the reported results, *id.* ¶ 118; (ii) falsely representing the patent enabled the production of functional antibodies, despite knowing that the refolding problem precluded that result, *id.* ¶¶ 69-71; and (iii) submitting inventor declarations falsely stating that the experiments described in the specification produced results "significantly higher than background," even though, in reality, they knew—and admitted to their colleagues—that those results were "barely measurable above background." *Id.* ¶¶ 121-25.

As set out above, because Defendants made these affirmative misrepresentations in the patent specification itself and in affidavits submitted to the PTO, they are "inherently material" under *Therasense*.  *See Therasense*, 649 F.3d at 1292; *see also Rohm*, 722 F.2d at 1571 ("[T]here is no room to argue that the

submission of false affidavits is not material."); *Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1996) ("Affidavits are inherently material.").  As such, they could not be cured by Defendants' perfunctory and silent purported "disclosure" absent any explicit correction of Defendants' prior misstatements, which they did not make.  *See, e.g.*, *Rohm*, 722 F.2d at 1572-73; *Amgen, Inc. v. Ariad Pharmas., Inc.*, 577 F. Supp. 2d 702, 722 (D. Del. 2008) (holding that fact issue precluded *summary judgment* on inequitable conduct where applicant submitted affidavit inconsistent with prior articles authored by the affiant, even with subsequent disclosure of the articles).

Finally, each of these misrepresentations and omissions was material not only to patentability in general, but to enablement issues raised during prosecution.  Answer ¶¶ 56, 70.  Had these misrepresentations and omissions been brought to the attention of the PTO, they would have resulted in the rejection of Defendants' application.  *Id.* ¶¶ 54-56, 90.[6]  Therefore, HGS has stated a claim for inequitable conduct based on Defendants misrepresentations regarding enablement.

## C. Misrepresentations Regarding the Prior Art

HGS has likewise adequately pled inequitable conduct based on Defendants' misrepresentations and non-disclosure of highly material prior art. Defendants dumped the Stanford Application on the examiner at the eleventh hour of the Cabilly II prosecution, failed to disclose the critical Axel patent until reexamination, and made materially inconsistent, false, and misleading statements regarding the Valle reference.  *See, e.g.*, *id.* ¶¶ 96-117.  Defendants also breached their duty of candor during the reexamination itself when their agents, Jeffery Kushan and Wendy Lee, told the PTO that the Axel patent was "irrelevant to the claims of the '415 patent," in direct contradiction of (i) earlier sworn testimony by their scientist, John Ridgway, that the two patents teach and are relevant to the exact

---

[6]   Contrary to Defendants' suggestion, Motion at 5, the reexamination did not address enablement.  37 C.F.R. 1.552 (limiting reexamination to *prior art*).

same process, and (ii) their proffered expert Dr. Scott's opinion that the Axel patent teaches the same process as the Cabilly I patent for encoding a heavy or light chain. *Id.* ¶¶ 112-114.

Once again, Defendants do not, because they cannot, contest the specificity of HGS's pleading. Instead, they argue that HGS's inequitable conduct claims are without merit because all of these references were eventually before the PTO, and because the Ridgway Declaration was no more than "attorney argument." *See, e.g.*, Motion at 5:25-6:16, 8:6-10:3. Both arguments fail.

First, Defendants failed to submit the Stanford reference until they had already received a verbal notice of allowance, indicating that prosecution was effectively closed and that subsequent submissions would be considered only perfunctorily, if at all. Second, Defendants concealed the highly material Axel patent until *reexamination*, by which time it was too late as a matter of law to cure Defendants' earlier nondisclosure and during which reexamination Defendants made further misstatements, as explained above. Moreover, the failure to disclose both of these references much earlier—during the Cabilly I prosecution—is itself independently sufficient to state a claim for inequitable conduct with respect to the related Cabilly II patent, under the doctrine of infectious unenforceability. *See, e.g.*, *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1991) ("[A] breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same *or a related* application.") (emphasis added). The applicants' failure to disclose these references until mere days before a formal notice of allowance was issued (or, in the case of Axel, until years after the patent had issued) was deliberately intended to isolate them from earlier and directly related misstatements regarding the key Valle reference. The assertion by Defendants' attorney, Max Hensley, that Valle was "readily distinguishable from the instant claims in that the oocytes are not transformed with DNA" was not only in direct conflict with Genentech's earlier

-17-

assertions to the EPO, it was a purported distinction that the Stanford application and Axel patent would have unambiguously obviated—leading to a rejection over the prior art—had they been timely disclosed.  Answer ¶¶ 97, 99, 105-106, 108-111.

These allegations are thus sufficient to set out a claim for inequitable conduct based on affirmative misrepresentations, and are not properly characterized as mere failures to highlight or attorney argument.  *See, e.g.*, *Amgen*, 577 F. Supp. 2d at 722-24 (holding that submission of expert declaration while withholding articles necessary to fully assess opinions therein was affirmatively misleading despite later submission of articles to PTO); *see also Environ Products, Inc. v. Total Containment, Inc.*, No. 9504467, 1997 WL 364464, *4-*7 (E.D. Pa. June 19, 1997) (holding that fact issue existed as to inequitable conduct, where applicant failed to disclose to PTO inconsistent statements made by patentee during related litigation regarding patentability in light of the prior art).  Indeed, as noted above, *Therasense* itself recognized that undisclosed inconsistencies between positions taken before the EPO and PTO, such as the diametrically opposed positions Defendants took regarding the significance of Valle—which could not be independently assessed by the examiner due to Defendants' purposeful withholding of material art—state a claim for inequitable conduct.  *See Therasense*, 649 F.3d at 1295-96; *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.*, 837 F. Supp. 1444, 1475 (N.D. Ind. 1992), *aff'd*, 11 F.3d 1072 (Fed. Cir. 1993), *cert. denied*, 511 U.S. 1128 (1994) (finding inequitable conduct where, *inter alia*, applicant made a "key representation" that was "completely inconsistent" with a representation made to a different examiner).

Likewise, the Ridgway Declaration was not mere "attorney argument." Motion at 9:12-14.  John Ridgway was a molecular biologist employed by Genentech who submitted a sworn declaration in support of Defendants' U.S. Application No. 09/909,611, a divisional of the Cabilly II application.  Answer ¶ 112.  His declaration made sworn factual assertions regarding the close

-18-

relationship between the Cabilly II and Axel patents, which were starkly
inconsistent with Defendants' representations to the PTO that the Axel patent was
"irrelevant to the claims of the '415 patent claims." *Id.* ¶ 113.[7]  The Federal Circuit
has expressly rejected as "chutzpah" the brazen suggestion that this type of
testimony is immaterial. *See, e.g.*, *Refac*, 81 F.3d at 1584 ("[A]rguing that an
affidavit submitted to persuade was defective as presenting only opinion, not fact,
and that it should be discounted, qualifies only for a chutzpah award.").

Defendants' failure to disclose the Ridgway Declaration until re-
examination—and failure to disclose Dr. Scott's admission at all—while concealing
and mischaracterizing the Axel patent states a claim for inequitable conduct. *See,
e.g.*, *Ormco Corp. v. Align Tech., Inc.*, No. CV 03-16 CAS (ANx), 2009 WL
466070, at *11 (C.D. Cal. Feb. 23, 2009) (finding failure to disclose an expert
declaration, submitted in connection with a prior patent prosecution describing the
scope of a prior art reference inconsistently with patentee's position in the current
patent prosecution, was material and was not cured by disclosure of reference itself).

### D.    Misrepresentations Regarding the Cabilly Patents' Scope

HGS has also pled that Defendants knowingly and intentionally
attempted to surmount the fatal enablement flaws discussed above by falsely
representing that the count at issue did *not* require assembly of heavy and light chain
molecules into a functional antibody—in an attempt to overcome Boss's priority
challenge—but later taking the fundamentally inconsistent position that heavy and
light chain assembly to form active antibodies *was* required by all issued claims, in
order to overcome prior art during reexamination.  Answer ¶ 131.

Likewise, Defendants took inconsistent positions between the Cabilly I
and Cabilly II patent prosecutions to avoid a variety of anticipation and double

---

[7]    By contrast, *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326
(Fed. Cir. 2000) (Motion at 9:14-15), is distinguishable because it specifically
addressed inventor argument that "did *not* contain *any factual assertions* that
could give rise to a finding of misrepresentation." *Id.* (emphasis supplied).

patenting findings, including repeatedly describing their invention during the Cabilly I prosecution as requiring co-expression of heavy *and* light chains in a single host cell, while later taking the diametrically opposite position—that the Cabilly I patent only claimed the singular expression of "heavy *or* light" chains. *Id.* ¶ 133 (emphasis added).  The fact that the Cabilly I prosecution history was part of the record of Cabilly II did not relieve Defendants of their duty to "avoid mistakes in describing a submitted claim as corresponding to an allowed version of an earlier claim in the parent application." *Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 874 n.8 (Fed. Cir. 1988).  That Defendants mischaracterized the scope of the Cabilly I patent claims—only after they expired and were no longer of economic value—in order to save new, patentably indistinct claims similarly constitutes inequitable conduct.

Once again, Defendants' response to this allegation is to argue that all of this information was disclosed in one form or another to the PTO.  *See* Motion at 10:4-12:12.  But as set out above, disclosure in a continuation or related application cannot cure misconduct in an earlier prosecution.  And the mere fact that all of Defendants' inconsistent representations were "before" the PTO at some point does not cure Defendants' inequitable conduct.  *See, e.g.*, *Fox*, 922 F.2d at 803-04; *Kingsdown*, 863 F.2d at 874; *cf., e.g.*, *McKesson*, 487 F.3d at 925 (noting that an applicant "should not assume that a PTO examiner retains details of every pending file in his mind when he is reviewing a particular application").  Defendants did not merely "disavow" prior arguments, as in *Sprint Commc'ns. Co. L.P. v. Nuvox Commc'ns. Inc.*, Case No. 08-2047, 2009 WL 86565 (D. Kan. Jan. 12, 2009) (cited in Motion at 11:10-16), but instead *deliberately misstated* the scope of the Cabilly I and II patents at different points in time to deceive numerous different examiners and administrative patent judges on the Board of Patent Appeals and Interferences, all to ensure the patent with the latest expiration date survived.  *See, e.g.*, *Therasense*, 649 F.3d at 1292, 1296.

**E.    Concealment of the Best Mode and Misrepresentations Regarding Experimental Conditions Described in the Cabilly II Patent**

HGS has similarly set forth specific and detailed allegations showing that the Cabilly inventors deliberately and knowingly made false statements—both in the Cabilly II application itself and in later declarations—regarding the best mode used to practice the invention and the experimental conditions described in the specification.  *See, e.g.*, Answer ¶ 119.

Defendants argue that this allegation fails because (i) "a failure to disclose the best mode cannot constitute inequitable conduct under *Therasense*," Motion at 6:21-23, and (ii) inventor notebooks revealing these misrepresentations were ultimately disclosed to the PTO.  *Id.* at 6:23-7:3.  As to the first contention, Defendants cite not a single case supporting their position, and, to the contrary, it is undisputed that an intentional failure to disclose the best mode under these circumstances is material and supports a claim for inequitable conduct.  *See, e.g.*, *Consol. Aluminum Corp. v. Foseco Intern. Ltd.*. 910 F.2d 804, 808 (Fed. Cir. 1990); *see also Steierman v. Connelly*, 192 USPQ 433, 437 (Bd. Pat. Int. 1975) ("[W]e believe the Primary Examiner would have rejected the claims in the application on the ground [that] the specification did not disclose the best mode known to Connelly et al. at the time they filed their application.").

As to Defendants' second argument, the inventors' false assertions to the PTO were not cured—and certainly were not cured as a matter of law—by the later disclosure of "illegible," "unsigned," and "uncorroborated" notebooks, *Cabilly v. Boss*, 55 U.S.P.Q. 2d 1238, 1248-50 (B.P.A.I. Aug. 13, 1998), and affidavits, which were provided in an entirely different context and which did not alert the PTO to their significance or to the inventors' misrepresentations.  Moreover, HGS alleges that many of the inventors' affidavits *themselves* continued affirmatively to misrepresent and conceal the actual conditions used to achieve the experimental results described in the specification.  *See* Answer ¶ 124 (identifying examples of

-21-

false inventor declarations).  These allegations thus state a claim for inequitable

conduct.  *See, e.g.*, *Hoffman-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1367

(Fed. Cir. 2003) ("There was no suggestion by Roche that the use of the past tense

in Example VI was an oversight . . . .  Nor did Roche introduce any other evidence

to explain why the past tense was used to describe an experiment that was not

performed."); *Purdue Pharma*, 438 F.3d 1123, 1132-33 (Fed. Cir. 2006) (finding

material misrepresentations based on false suggestion that certain experimental

results had actually been obtained when they had not).

### F.    False Claim of Priority

Defendants' false representation that the Cabilly applicants were

entitled to priority based on the Cabilly I application is likewise sufficient to state a

claim for inequitable conduct.  "An applicant's misrepresentation that he is entitled

to the benefit of an earlier filing date is highly material."  *Li Second Family L.P. v.

Toshiba Corp.*, 231 F.3d 1373, 1378-80 (Fed. Cir. 2000).

Here, HGS alleges Defendants falsely represented to the PTO that the

Cabilly applicants were entitled to priority based on their Cabilly I application even

though they knew their invention was not enabled, conceived of, or reduced to

practice because, among other things, (i) the draft Cabilly application on which that

priority claim depended had a section on refolding that was entirely blank, (ii)

Defendants had already admitted the supreme difficulty of the refolding problem in

bacteria, and (iii) Defendants were unable to rebut the Burton and Abrahmsen

opinions that the refolding procedures described in the Cabilly specification simply

did not work.  *See, e.g.*, Answer ¶¶ 56, 61, 65-71.  These allegations squarely set out

a claim for inequitable conduct.  *See, e.g.*, *KangaROOS*, 778 F.2d at 1575-76

(finding fact issue precluded *summary judgment* on allegation that applicant falsely

claimed earlier priority date); *Digital Control Inc. v. Charles Machine Works*, 437

F.3d 1309, 1321 (Fed. Cir. 2006) (finding inventor's false statement that invention

was reduced to practice on a specific date, when invention was not reduced to

practice until later, was material); *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 908 (N.D. Ill. 2006) (finding that improper assertion of priority was highly material and constituted inequitable conduct).  Nor were Defendants' earlier false claims of priority cured by Defendants' post-interference disclosure to the PTO of the litigation record in the district court action.  *See, e.g.*, *KangaROOS*, 778 F.2d at 1576 ("[I]f the claim for priority . . . support[s] an inference of fraud or inequitable conduct, lapse on the part of the examiner does not excuse the applicant.").

### G.   Concealment of the Cabilly Applicants' Exceptional Financial Interest

HGS has also stated a claim for inequitable conduct based on Defendants' repeated failure to disclose the Cabilly applicants' enormous financial interest in the patent, at the same time that they submitted critical factual declarations on a variety of issues.  The Federal Circuit has repeatedly held that an intentional failure to disclose a declarant's personal and financial incentives can constitute inequitable conduct, where that interest materially impacts his credibility and motive to lie.  *See, e.g.*, *Sanders v. The Mosaic Co.*, 418 Fed. Appx. 914, 2011 WL 1491248, at *5 (Fed. Cir. April 20, 2011); *Ferring B.V. v. Barr Labs, Inc.*, 437 F.3d 1181, 1187 (Fed. Cir. 2006).

While *some* financial self-interest in a patent's issuance may be inherent in inventorship, as Defendants argue, in this case, certain of the inventor declarants stood to receive *tens or hundreds of millions* of dollars in royalties from the patent, a stake in the outcome that is an unusually powerful motivator and one that the PTO should have been informed of in order to assess the declarants' credibility.  This highly unusual and material fact triggered an affirmative duty to disclose not only the fact but the magnitude of the inventors' financial interest.  *Cf. Ferring*, 437 F.3d at 1187 ("Given the *ex parte* nature of proceedings before the PTO, it is especially important that the examiner has all the information needed to determine whether and to what extent he should rely on declarations presented by

1   the applicant.").  HGS has adequately pled that the PTO would not have issued the

2   patent in reliance on self-interested inventor testimony, had it known the magnitude

3   of the inventors' extraordinary financial motivation to ensure the patent issued.[8]

4       **H.**    **Late and Deceptive Filing of the Celltech Settlement Agreement**

5            Finally, HGS adequately alleges that, to avoid scrutiny from both the

6   PTO and the Federal Trade Commission regarding the Celltech settlement,

7   Defendants intentionally failed to timely file the settlement agreement with the PTO

8   and then falsely claimed they were unaware of the deadline for disclosure.  *See, e.g.*,

9   Answer ¶¶ 81-87.  HGS alleges that Defendants' claimed ignorance was false

10  because, *inter alia*, Defendants submitted numerous other settlement agreements

11  pursuant to 35 U.S.C. § 135 weeks earlier, suggesting they did know the filing

12  deadline.  Answer ¶¶ 83-85.  This misconduct was material not only because the

13  PTO would not have issued the patent had it known that Defendants' deliberate

14  delay was an attempt to preclude scrutiny of the settlement, but because untimely

15  disclosure of a settlement of an interference proceeding *itself* renders the patent

16  unenforceable as a matter of law.  *See* 35 U.S.C. § 135(c).

17           Defendants' only response to this allegation is to rely on the Court's

18  post-discovery determination in *MedImmune* that it was "possible" the PTO would

19  have accepted the settlement in any event.  Motion at 7:8-8:5.[9]  But HGS need only

20  *plausibly allege* here that the patent would not have issued had the PTO been aware

21  of Defendants' misconduct.  *Twombly*, 550 U.S. at 556-57.  The facts alleged here

22  ───────────────

[8]    Genentech itself has previously argued that an applicant is required to

23  disclose financial interests far smaller than the inventors' interests here.  *See,
    e.g.*, Orloff Decl. ¶ 6, Ex. E (Reexamination Appeal Brief at 63-64 and n.21)

24  (arguing that position of a witness as Director for MedImmune should have
    been disclosed to the PTO).

25  [9]    The Court also found that "*even if Genentech . . . committed fraud* in fulfilling

26  the requirements of [§ 135(c)] no legal authority supports the proposition that
    this could be the basis of an *antitrust or unfair competition* claim."  Orloff

27  Decl. ¶ 3, Ex. B at *9 (Order Denying Leave) (emphasis added).  This
    reasoning is inapplicable to a claim for inequitable conduct based on

28  misrepresentations before the PTO.

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

1   are sufficient to raise an inference that the PTO would not have issued the patent

2   had it known of Defendants' deception.

3   **IV.   HGS Has Stated a Claim for Unclean Hands**

4          Defendants' motion to dismiss HGS's counterclaim and defense of

5   unclean hands rests on the same grounds as its motion to dismiss HGS's inequitable

6   conduct claims, Motion at 13:26-14:22, and fails for the same reasons.  It also fails

7   for the independent reason that *Therasense* explicitly preserved unclean hands as a

8   separate and distinct defense from inequitable conduct, requiring a lesser showing of

9   materiality where a patentee engages in an overarching scheme like the one HGS

10  sets out here.  *Therasense*, 649 F.3d at 1287(noting that the unclean hands doctrine

11  remains available to supply a remedy for "deliberately planned and carefully

12  executed schemes to defraud not only the PTO but also the courts ").

13         Moreover, regardless of the outcome of Defendants' motion to dismiss

14  HGS's inequitable conduct claims, HGS's unclean hands counterclaim cannot be

15  dismissed for the independent reason that it is also based on prosecution laches—a

16  separate defense that Defendants do not even challenge here.  Answer ¶¶ 169-73.

17  Defendants cite no authority for the proposition that the unclean hands defense may

18  be "stricken" simply because it shares facts with other defenses.  *Cf.* Motion at

19  13:26-14:22 and fn 3.  Because Defendants do not suggest, must less persuasively

20  establish, that HGS has failed to plead each of the elements of unclean hands, their

21  motion to dismiss that affirmative defense and counterclaim must be denied.[10]

22                        **CONCLUSION**

23         For the foregoing reasons, HGS respectfully requests that the Court

24  deny Defendants' motion in its entirety.

25

---

26  [10]   To the extent the Court finds the *MedImmune* proceeding relevant to
       Defendants' motion or takes judicial notice of that proceeding here, HGS
27     respectfully requests access to the sealed filings in that case and leave to
       supplement its Opposition and amend its Answer accordingly.  Should the
28     Court grant Defendants' motion, HGS respectfully requests leave to amend
       to assert additional allegations supporting its inequitable conduct defense.

HGS'S OPPOSITION TO MOTION TO DISMISS THIRD COUNTERCLAIM

DATED: October 24, 2011            Respectfully submitted,


                                   /s/ Harrison J. Frahn IV
                                   SIMPSON THACHER & BARTLETT LLP
                                   Henry B. Gutman (*pro hac vice*)
                                   Noah M. Leibowitz (*pro hac vice*)
                                   425 Lexington Avenue
                                   New York, New York 10017
                                   Telephone: (212) 455-2000
                                   Facsimile:  (212) 455-2502
                                   hgutman@stblaw.com
                                   nleibowitz@stblaw.com

                                   Harrison J. Frahn IV (#206822)
                                   2550 Hanover Street
                                   Palo Alto, CA 94304
                                   Telephone: (650) 462-9406
                                   Facsimile:  (650) 255-5035
                                   hfrahn@stblaw.com

                                   *Attorneys for Plaintiff and Counter-*
                                   *Defendant Human Genome Sciences, Inc.*